DOO7



MAR 03 2020

LERK U.S. DISTRICT COURT
ST. DIST. OF PENNSYLVANIA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      )
                                          )
                 v.                  )      Criminal No. 20 - 9 ERIE
                                           )
NIMA RODEFSHALOM         )      (18 U.S.C. §§ 371, 1349, 1347)
MEHRAN DAVID KOHANBASH   )

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| NIMA RODEFSHALOM | ) |
| MEHRAN DAVID KOHANBASH | ) |
| JOSEPH KOHAN | ) |
|     a/k/a Joe Kahan | ) |
|     a/k/a Daryoush Kohanbash | ) |
|     a/k/a Daryoujn Kohanbash | ) |
| INSURE NUTRITION, INC. | ) |
|     a/k/a Specialty Med Services | ) |
|     a/k/a Cure Plus | ) |
| AFFORDABLE PHARMACY, INC. | ) |
| ASC PHARMACEUTICAL, LLC | ) |
| DQD ENTERPRISE CORPORATION | ) |
|     a/k/a Rx One Pharmacy | ) |
| DTST VENTURES, LLC | ) |
|     a/k/a ABI Pharmacy | ) |
| ECONO PHARMACY, INC. | ) |
| EMERSON PHARMACY, INC. | ) |
|     a/k/a Loyola Pharmacy | ) |
| GENOREX PHARMACEUTICAL, LLC | ) |
| NUTRITION PLUS, INC. | ) |
|     a/k/a IV Med Services | ) |
| PHARMATEK PHARMACY, INC. | ) |
| PREMIER MED SERVICES, INC. | ) |
| REXFORD PHARMACY, INC. | ) |
| SPECIALTY PHARMACY MANAGEMENT | ) |
|     OF AMERICA, INC. | ) |
| SOLUTECH PHARMACEUTICALS, LLC | ) |
|     a/k/a Rainbow Gold | ) |
| VILLAGE DRUG & COMPOUNDING, INC. | ) |
|     a/k/a Science Pharmaceutical | ) |
| VITAMED LLC | ) |
|     a/k/a Vitamed Pharmacy | ) |

**INFORMATION**

The United States Attorney charges:

INTRODUCTION

At all times material to this Information, unless otherwise alleged:

1)      "Beneficiaries" were individuals eligible to receive benefits under a health care benefit program.

2)      Tricare was a federal health insurance program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries world-wide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors.  The Defense Health Agency ("DHA"), an agency of the DOD, was the governmental entity responsible for overseeing and administering the Tricare program.  Tricare was a "health care benefit program," as defined by 18 U.S.C. § 24(b).  Tricare also was a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), that affected commerce.  Tricare offered health insurance benefits for medically necessary prescription drugs that were prescribed by a licensed medical professional.

3)      Highmark Inc. ("Highmark") was a private health insurance provider that was headquartered in the Western District of Pennsylvania.  Highmark and hundreds of other private health insurance providers (collectively, the "Private Carriers") were each a "health care benefit program," as defined by 18 U.S.C. § 24(b).  Private Carriers offered health insurance benefits for medically necessary prescription drugs that were prescribed by a licensed medical professional.

4)      Both Tricare and the Private Carriers typically required beneficiaries to pay a supplemental amount of money, known as a copayment ("copay"), for prescription drugs.

5)     Pharmacy Benefit Managers ("PBMs") were third-party entities that administered prescription drug plans for governmental and private health insurance providers including Tricare and the Private Carriers.  PBMs were responsible for processing and paying a beneficiary's prescription drug claim.  Pharmacies submitted a beneficiary's prescription drug claim to the PBMs.  Typically, a beneficiary presented a prescription to a pharmacy, and the pharmacy then submitted a prescription drug claim to the PBM associated with the beneficiary's health insurance provider.  The PBM processed the claim, determined whether the submitting pharmacy was entitled to payment for the claim, and paid the pharmacy.  The health insurance provider reimbursed the PBM for its payment to the pharmacy.

6)     Express Scripts was the sole PBM that processed prescription claims on behalf of Tricare.  Express Scripts, CVS Caremark, Optum, Prime Therapeutics, Argus, MedImpact, Navitus, and other companies were PBMs that processed prescription claims on behalf of Private Carriers.

7)     PBMs, including, but not limited to, those listed in the above paragraph, and pharmacies entered into contractual arrangements called "provider agreements."  These provider agreements identified the PBMs' and the pharmacies' respective obligations and responsibilities.  As part of these provider agreements, pharmacies were required to collect copays for prescription drugs.  PBMs and health insurance providers required the collection of copays to prevent fraud, as copays sensitized beneficiaries to the cost of their medication(s), and gave beneficiaries financial incentives to not accept medications that had little to no value to the beneficiaries.

8)     PBMs typically audited pharmacies to ensure compliance with the terms of these provider agreements.  As part of such audits, PBMs investigated the collection of the required copays by the pharmacies.  If a pharmacy was not in compliance with its contractual obligations,

such as not collecting copays, a PBM had the right to terminate the contract with the pharmacy. As a result of termination, the pharmacy would have been precluded from submitting claims to the PBM and to the associated health insurance provider.

9)    Every licensed pharmacy in the United States and its territories was assigned a unique pharmacy identification number by the National Council for Prescription Drug Programs ("NCPDP_ID"). States also provided pharmacy license numbers to pharmacies. As authorized by federal law, health care providers were issued a unique identification number known as a national provider identifier ("NPI").

10)   Compound medications were drugs specifically manufactured by the combining, mixing, or altering of ingredients of other drugs or multiple other drugs.

11)   Bariatric medicine was a branch of medicine that dealt with the study, treatment, and prevention of obesity and the medical issues associated with obesity. Bariatric patients were individuals who suffered from medical conditions related to being overweight or obese. Many bariatric patients were beneficiaries of Tricare and the Private Carriers. Bariatric surgery was a medical procedure that reduced the size of a bariatric patient's stomach.

12)   Immediately before and after bariatric surgery, for a period of time, bariatric patients were restricted in their diets. Such bariatric patients were medically advised to drink nutritional shakes that were available at local grocery stores. These nutritional shakes were not prescription medications, such that no prescription was needed to obtain these nutritional shakes.

<u>DEFENDANTS</u>

13)   The defendant, NIMA RODEFSHALOM, was a resident of Los Angeles, California and Henderson, Nevada. He was a registered pharmacist licensed to practice in the

States of California and Nevada (CA License # 55990 and NV License # 16493).  His NPI was 1275677510.

14)   The defendant, MEHRAN DAVID KOHANBASH, was a resident of Beverly Hills, California and Henderson, Nevada.  He was a registered pharmacist licensed to practice in the State of California (CA License # 44499).  He was an uncle to defendant NIMA RODEFSHALOM.

15)   The defendant, JOSEPH KOHAN, was a resident of Los Angeles, California.  He also is known as Joe Kahan, Daryoush Kohanbash, and Daryoujn Kohanbash.  He was the brother of defendant MEHRAN DAVID KOHANBASH and an uncle to defendant NIMA RODEFSHALOM.

16)   The defendant, INSURE NUTRITION, INC. ("INSURE NUTRITION"), was a California Corporation formed in and around February 2014.  INSURE NUTRITION maintained a principal executive office in Los Angeles, California and a principal business office in Inglewood, California.  INSURE NUTRITION also did business as Specialty Med Services and Cure Plus.  INSURE NUTRITION maintained a call center team and billing personnel, and purported to be a pharmacy that provided prescription drugs to beneficiaries and/or patients (CA Pharmacy License # 51985).  INSURE NUTRITION's NPI was 1942697529 and its NCPDP was 5655002.  From its inception, defendants NIMA RODEFSHALOM and MEHRAN DAVID KOHANBASH, through themselves and/or through the use of others, came to primarily control, operate, and manage INSURE NUTRITION.

17)   The defendant, AFFORDABLE PHARMACY, INC. ("AFFORDABLE"), was a Texas Corporation formed in and around May 2012.  AFFORDABLE was a company that purported to be a pharmacy and purported to provide prescription drugs to beneficiaries and/or

patients (CA Pharmacy License # 31558). AFFORDABLE'S NPI was 180123436 and its NCPDP was 5908578. In and around June 2015, defendants NIMA RODEFSHALOM and JOSEPH KOHAN, through themselves and/or through the use of others, came to primarily control, operate, and manage AFFORDABLE.

18)     The defendant, ECONO PHARMACY, INC. ("ECONO"), was a Texas Corporation formed in and around April 2010. ECONO was a company that purported to be a pharmacy and purported to provide prescription drugs to beneficiaries and/or patients. ECONO's NPI was 1972810141and its NCPDP was 5901081. In and around November 2014, defendants NIMA RODEFSHALOM and JOSEPH KOHAN, through themselves and/or through the use of others, came to primarily control, operate, and manage ECONO.

19)     The defendant, EMERSON PHARMACY, INC. ("EMERSON"), was a California Corporation formed in and around June 2007. EMERSON also did business as Loyola Pharmacy. EMERSON was a company that purported to be a pharmacy and purported to provide prescription drugs to beneficiaries and/or patients (CA Pharmacy License # 40605). EMERSON's NPI was 1619036043 and its NCPDP was 0508967. From its inception, defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, through themselves and/or through the use of others, came to primarily control, operate, and manage EMERSON.

20)     The defendant, PREMIER MED SERVICES ("PREMIER MED"), was a Texas Corporation formed in and around October 2011. In and around January 2012, PREMIER MED registered in the State of California. PREMIER MED was a company that purported to be a pharmacy and purported to provide prescription drugs to beneficiaries and/or patients (CA Pharmacy License # 50857). PREMIER MED's NPI was 1972864460 and its NCPDP was

5644073.  From its inception, defendants NIMA RODEFSHALOM and MEHRAN DAVID KOHANBASH, through themselves and/or through the use of others, came to primarily control, operate, and manage PREMIER MED.

      21)   The defendant, VILLAGE DRUG & COMPOUNDING, INC. ("VILLAGE"), was a California Corporation formed in and around February 2010.  VILLAGE also did business as Science Pharmaceutical.  VILLAGE was a company that purported to be a pharmacy and purported to provide prescription drugs to beneficiaries and/or patients (CA Pharmacy License # 50345).  VILLAGE's NPI was 1437463650 and its NCPDP was 5638575.  From its inception, defendants MEHRAN DAVID KOHANBASH and JOSEPH KOHAN, through themselves and/or through the use of others, came to primarily control, operate, and manage VILLAGE.

      22)   The defendant, ASC PHARMACEUTICAL, LLC ("ASC PHARMACEUTICAL"), was a Texas Limited Liability Company formed in and around January 2017.  From its inception, defendants MEHRAN DAVID KOHANBASH and JOSEPH KOHAN, through themselves and/or through the use of others, came to primarily control, operate, and manage ASC PHARMACEUTICAL.

      23)   The defendant, DQD ENTERPRISE CORP. ("DQD ENTERPRISE"), was a Texas Corporation formed in and around January 2014.  In July 2014, DQD ENTERPRISE registered an assumed name of Rx One Pharmacy.  DQD ENTERPRISE was a company that purported to be a pharmacy and purported to provide prescription drugs to beneficiaries and/or patients. DQD ENTERPRISE's NPI was 1124360391and its NCPDP was 5908263.  In and around February 2016, defendants NIMA RODEFSHALOM and JOSEPH KOHAN, through themselves

and/or through the use of others, came to primarily control, operate, and manage DQD ENTERPRISE.

24)     The defendant, DTST VENTURES, LLC ("DTST VENTURES"), was a Texas Limited Liability Company formed in and around May 2008. In and around April 2012, DTST VENTURES registered an assumed name of ABI Pharmacy. DTST VENTURES was a company that purported to be a pharmacy and purported to provide prescription drugs to beneficiaries and/or patients. DTST VENTURES's NPI was 1134470727and its NCPDP was 5906930. In and around December 2016, defendants NIMA RODEFSHALOM and JOSEPH KOHAN, through themselves and/or through the use of others, came to primarily control, operate, and manage DTST VENTURES.

25)     The defendant, GENOREX PHARMACEUTICAL, LLC ("GENOREX"), was a Wyoming Limited Liability Company formed in and around September 2016. From its inception, defendant NIMA RODEFSHALOM, through himself and/or through the use of others, came to primarily control, operate, and manage GENOREX.

26)     The defendant, NUTRITION PLUS, INC. ("NUTRITION PLUS"), was a California Corporation formed in and around January 2011. NUTRITION PLUS also did business as IV Med Services. NUTRITION PLUS was a company that purported to be a pharmacy and purported to provide prescription drugs to beneficiaries and/or patients (CA Pharmacy License # 50593). NUTRITION PLUS's NPI was 1225337843 and its NCPDP was 5640481. From its inception, defendants NIMA RODEFSHALOM and MEHRAN DAVID KOHANBASH, through themselves and/or through the use of others, came to primarily control, operate, and manage NUTRITION PLUS.

27)    The defendant, PHARMATEK PHARMACY, INC. ("PHARMATEK PHARMACY"), was an Arizona Corporation formed in and around March 2014. PHARMATEK PHARMACY was a company that purported to be a pharmacy and purported to provide prescription drugs to beneficiaries and/or patients. PHARMATEK PHARMACY's NPI was 1003235144 and its NCPDP was 0358805.    From its inception, defendants NIMA RODEFSHALOM and JOSEPH KOHAN, through themselves and/or through the use of others, came to primarily control, operate, and manage PHARMATEK PHARMACY.

28)    The defendant, REXFORD PHARMACY, INC. ("REXFORD"), was a California Corporation formed in and around January 2002 with principal place of business in Los Angeles, California.  REXFORD was a company that purported to be a pharmacy and purported to provide prescription drugs to beneficiaries and/or patients (CA Pharmacy License ## 54567 and 55815).  REXFORD's NPI was 1730235243 and its NCPDP was 0566426.   In and around June 2016, defendant NIMA RODEFSHALOM, through himself and/or through the use of others, came to primarily control, operate, and manage REXFORD.

29)    The    defendant,    SOLUTECH    PHARMACEUTICALS,    LLC ("SOLUTECH"), was an Arizona Limited Liability Company formed in and around October 2015.  SOLUTECH also did business as Rainbow Gold.   From its inception, defendants NIMA RODEFSHALOM and JOSEPH KOHAN, through themselves and/or through the use of others, came to primarily control, operate, and manage SOLUTECH.  SOLUTECH was a registered labeler with the Food & Drug Administration (FDA Labeler Code 70350).

30)    The defendant, SPECIALTY PHARMACY MANAGEMENT OF AMERICA, INC. ("SPMA"), was a Nevada Corporation formed in and around March 2015. From

its inception, defendant NIMA RODEFSHALOM, through himself and/or through the use of others, came to primarily control, operate, and manage SPMA.

31)     The defendant, VITAMED LLC ("VITAMED"), was a Texas Limited Liability Company formed in and around October 2010. VITAMED was a company that purported to be a pharmacy and purported to provide prescription drugs to beneficiaries and/or patients. VITAMED's NPI was 1427349778 and its NCPDP was 5903085. In and around March 2017, defendants NIMA RODEFSHALOM and JOSEPH KOHAN, through themselves and/or through the use of others, came to primarily control, operate, and manage VITAMED.

32)     Defendants INSURE NUTRITION, AFFORDABLE, DQD ENTERPRISE, DTST VENTURES, ECONO, EMERSON, NUTRITION PLUS, PHARMATEK PHARMACY, PREMIER MED, REXFORD, VILLAGE, and VITAMED are collectively referred herein as "DEFENDANT PHARMACIES."

MANNER AND MEANS OF THE CONSPIRACY/SCHEME AND ARTIFICE TO DEFRAUD

33)     From in and around September 2013, and continuing thereafter until in and around July 2015, in the Western District of Pennsylvania and elsewhere, defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, JOSEPH KOHAN, INSURE NUTRITION, AFFORDABLE, ECONO, EMERSON, PREMIER MED, VILLAGE, and co-conspirators known and unknown to the U.S. Attorney, did offer and pay remunerations (including kickbacks, bribes, and rebates), that is, nutritional shakes, to bariatric patients to induce such patients to purchase, order, and arrange for the purchasing and order of prescription drugs for which payment was made by a federal health care program, that is, Tricare.

34)     From in and around September 2013, and continuing thereafter until in and around May 2018, in the Western District of Pennsylvania and elsewhere, defendants NIMA

RODEFSHALOM, MEHRAN DAVID KOHANBASH, JOSEPH KOHAN, INSURE NUTRITION, AFFORDABLE, ASC PHARMACEUTICAL, DQD ENTERPRISE, DTST VENTURES, ECONO, EMERSON, GENOREX, NUTRITION PLUS, PHARMATEK PHARMACY, PREMIER MED, REXFORD, SOLUTECH, SPMA, VILLAGE, VITAMED, and co-conspirators known and unknown to the U.S. Attorney, did execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs, that is, the Private Carriers, to obtain, by means of false and fraudulent pretenses, representations, and promises, monies owned by and under the custody and control of the Private Carriers by not collecting copays for prescription drugs that were submitted as claims to PBMs.

35)    It was a part of the scheme and artifice that defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, through themselves and/or through the use of others known to the U.S. Attorney, primarily controlled, operated, and managed the defendants INSURE NUTRITION, AFFORDABLE, ASC PHARMACEUTICAL, DQD ENTERPRISE, DTST VENTURES, ECONO, EMERSON, GENOREX, NUTRITION PLUS, PHARMATEK PHARMACY, PREMIER MED, REXFORD, SOLUTECH, SPMA, VILLAGE, and VITAMED.

36)    It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, defendant INSURE NUTRITION advertised on online forums and websites dedicated to bariatric patients and patients who had undergone bariatric surgery, such as BariatricPal and ObesityHelp, that patients could obtain nutritional shakes without having to pay for them.

37)   It was further a part of the scheme and artifice that defendant INSURE NUTRITION maintained the website www.insurenutrition.com on servers located in the Commonwealth of Virginia.

38)   It was further a part of the scheme and artifice that defendant INSURE NUTRITION created the advertisement to redirect individuals to the website www.insurenutrition.com.

39)   It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, defendant INSURE NUTRITION, through the website www.insurenutrition.com, while knowing that nutritional shakes were not covered by health insurance providers, falsely represented that nutritional shakes were covered by health insurance providers in order to induce bariatric patients to provide their insurance information to defendant INSURE NUTRITION.  For example, the website www.insurenutrition.com, stated the following:  "Some bariatric surgeons recommend that their patients drink protein shakes pre-operatively to prepare their bodies for the weight–loss procedure.  Nearly all surgeons require that you drink protein shakes immediately after bariatric surgery.  Click here to check if you are eligible to have your health insurance pay for your nutritional supplements."

40)   It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, defendant INSURE NUTRITION, through the website www.insurenutrition.com, provided a registration webpage as a method by which bariatric patients could check if they purportedly qualified for free nutritional shakes through their health insurance providers.  The registration webpage required a patient to provide his or her name, contact information (including

mailing address and phone number), birth date, health insurance coverage information, medical condition/procedures, doctor's contact information, and preferred nutritional shake flavor. This information was sent to defendant INSURE NUTRITION's call center team. Defendant INSURE NUTRITION's billing personnel also received this information.

41)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, defendant INSURE NUTRITION, through the website www.insurenutrition.com, provided a telephone number as an alternative method by which bariatric patients could check if they purportedly qualified for free nutritional shakes through their health insurance providers. Through this method, each patient provided his or her name, contact information (including mailing address and phone number), birth date, health insurance coverage information, medical condition/procedures, doctor's contact information, and preferred nutritional shake flavor. Defendant INSURE NUTRITION's call center team received this information from the patients. Defendant INSURE NUTRITION's billing personnel also received this information.

42)     It was further a part of the scheme and artifice that the call center for defendant INSURE NUTRITION, using a sales call script that was approved by defendants NIMA RODEFSHALOM and MEHRAN DAVID KOHANBASH, called the patients purportedly to confirm the patients' insurance information and nutritional shake flavors. During this call, irrespective of patients' need, INSURE NUTRITION's call center offered the bariatric patients medication, such as scar cream and metabolic supplements, that were designed to obtain high-yield payments from health care benefits programs ("High-Yield Medications"). INSURE NUTRITION's call center falsely represented that the bariatric patients did not have to pay

anything out-of-pocket for the High-Yield Medications because the High-Yield Medications were covered by the patients' health insurance providers.

43)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, from in and around September 2013 to in and around June 2017, at various times during the relevant period, defendants INSURE NUTRITION, AFFORDABLE, DQD ENTERPRISE, DTST VENTURES, ECONO, EMERSON, PHARMATEK PHARMACY, PREMIER MED, and VILLAGE manufactured compound medications that were High-Yield Medications.

44)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, from in and around July 2015 to in and around May 2018, at various times during the relevant period, INSURE NUTRITION, AFFORDABLE, DQD ENTERPRISE, DTST VENTURES, ECONO, EMERSON, PHARMATEK PHARMACY, and VILLAGE purchased from vendors products that were High-Yield Medications.

45)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, from in and around March 2016 to in and around May 2018, defendant SOLUTECH purchased generic prescription drugs and over-the-counter products and caused these products to be relabeled as SOLUTECH products and/or kits so SOLUTECH could purportedly claim to be the manufacturer of these products.  As the alleged manufacturer of these products, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, defendant SOLUTECH set the prices for these products and, thereby, converted these products into High-Yield Medications.  During this relevant time period, defendants INSURE

NUTRITION, AFFORDABLE, DQD ENTERPRISE, DTST VENTURES, EMERSON, NUTRITION PLUS, REXFORD, VILLAGE, and VITAMED possessed these SOLUTECH-related High-Yield Medications.

46)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, defendant INSURE NUTRITION's billing personnel submitted claims ("test claims") to the PBMs for a list of High-Yield Medications to determine what products were covered by the patients' health insurance providers and what products produced the highest financial benefit to INSURE NUTRITION. These test claims were reversed, that is, INSURE NUTRITION's billing personnel withdrew these submitted claims from the PBMs.

47)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, if a test claim revealed that none of the High-Yield Medications were covered by the patient's health insurance provider, defendant INSURE NUTRITION's call center team informed the patient that the patient did not qualify for free nutritional shakes.

48)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, if a test claim revealed that the patients' health insurance providers covered one or more of the tested High-Yield Medications, defendant INSURE NUTRITION's call center team sent pre-printed prescription forms for the High-Yield Medication that produced the highest financial benefit to INSURE NUTRITION to the patients' doctors. Knowing that prescriptions were unnecessary for nutritional shakes and that patients' health insurance providers did not cover nutritional shakes, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID

KOHANBASH, and JOSEPH KOHAN, defendant INSURE NUTRITION's call center team also sent pre-printed prescription forms for nutritional shakes to the patients' doctors. Along with these pre-printed prescription forms, defendant INSURE NUTRITION's call center team sent the doctors a letter or other communication to induce the doctors to sign the pre-printed prescription scripts. For example, some of these communications contained the following: "We are writing this letter to expedite the process for your patient, [Name]. Your patient has requested that you sign the prescription for a Post-Surgical treatment ([type of product]) and nutritional supplements. We would appreciate it if you sign the prescription forms (include you NPI #) and fax them back to us as soon as possible."

49)    It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, defendant INSURE NUTRITION's call center team notified patients that prescription forms were sent, or were being sent, to their doctors and that their receipt of free nutritional shakes required their doctors to sign the prescription forms. Defendant INSURE NUTRITION's call center team requested patients to encourage their doctors to sign the prescription forms.

50)    It was further a part of the scheme and artifice that, through defendants NIMA RODEFSHALOM's, MEHRAN DAVID KOHANBASH's, JOSEPH KOHAN's, and INSURE NUTRITION's efforts, doctors signed the pre-printed prescription forms and faxed them to defendant INSURE NUTRITION's call center team. Defendant INSURE NUTRITION's call center team shared the signed prescription forms with INSURE NUTRITION's billing personnel.

51)    It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH

KOHAN, after defendant INSURE NUTRTION received the signed prescription forms, DEFENDANT PHARMACIES shipped High-Yield Medications to the patients.

52)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, after defendant INSURE NUTRTION received the signed prescription forms, defendant EMERSON, and others known to the U.S. Attorney, purchased nutritional shakes from wholesale retailers, such as Costco Inc. Initially, DEFENDANT PHARMACIES shipped nutritional shakes to the patients.   Subsequently, defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, through themselves and others, had nutritional shakes shipped directly from the wholesale retailers to the patients.

53)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, after defendant INSURE NUTRTION received the signed prescription forms, DEFENDANT PHARMACIES submitted claims to PBMs for payments of the High-Yield Medications.

54)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, DEFENDANT PHARMACIES were instructed not to collect copays from Private Carriers' beneficiaries for the High-Yield Medications because many of these bariatric patients would have refused to receive the medically unnecessary High-Yield Medications if copays were collected, which would have resulted in defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, JOSEPH KOHAN, and DEFENDANT PHARMACIES not receiving high-dollar payments from the Private Carriers for the High-Yield Medications.

55)     It was further a part of the scheme and artifice that copays from the Private Carriers' beneficiaries were not collected for the High-Yield Medication claims.

56)     It was further a part of the scheme and artifice that defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, JOSEPH KOHAN, SOLUTECH, and the DEFENDANT PHARMACIES (collectively referred herein as "AUDIT DEFENDANTS"), and others known and unknown to the U.S. Attorney, knowing that the Private Carriers and the PBMs would not have paid claims for the High-Yield Medications if copays were not collected, employed various fraudulent methods, including but not limited to the subsequent two paragraphs, to deceive PBMs that copays were collected from the Private Carriers' beneficiaries when subjected to a PBM audit and/or in anticipation of a PBM audit.

57)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, one of the various fraudulent methods employed to deceive the PBM audits involved the AUDIT DEFENDANTS, and others known and unknown to the U.S. Attorney, having possessed prepaid debit cards, having loaded their own monies onto these prepaid debit cards, and subsequently charging these prepaid debit cards for fictitious transactions at the same dollar amount as a beneficiary's copay.  Defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN knew that this method resulted in the AUDIT DEFENDANTS paying themselves and not actually collecting copays.

58)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, another one of the various fraudulent methods employed to deceive PBM audits involved defendant SOLUTECH having obtained approximately 50 corporate credit cards

containing the first name of one employee who worked for a company under the control and/or management of an AUDIT DEFENDANT and the last name of a different employee who worked for a company under the control and/or management of an AUDIT DEFENDANT, without the knowledge or permission of the employee. AUDIT DEFENDANTS charged these SOLUTECH corporate credit cards for fictitious transactions at the same dollar amount as a beneficiary's copay. Defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN knew that this method resulted in the AUDIT DEFENDANTS paying themselves and not actually collecting copays.

59)     It was further a part of the scheme and artifice that the AUDIT DEFENDANTS falsely represented to the PBMs that these fictitious transactions reflected the collection of copays.

60)     It was further a part of the scheme and artifice that the DEFENDANT PHARMACIES received payments from the PBMs for the submitted High-Yield Medications claims. Tricare and the Private Carriers reimbursed the PBMs for these submitted High-Yield Medication claims.

61)     It was further a part of the scheme and artifice that, at the direction of defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, the DEFENDANT PHARMACIES moved the proceeds from payments for these High-Yield Medication claims to bank accounts associated with the AUDIT DEFENDANTS, defendant ASC PHARMACEUTICAL, defendant GENOREX, and defendant SPMA, and others for the ultimate disposition to defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, and JOSEPH KOHAN, and others known and unknown to the U.S. Attorney.

62)     It was further a part of the scheme and artifice that, on or about March 3, 2015, a person known to the U.S. Attorney as R.K., a Tricare beneficiary, received nutritional shakes and High-Yield Medication from defendant ECONO to an address in Erie, Pennsylvania, after R.K. had provided his/her insurance information to defendant INSURE NUTRITION.

63)     It was further a part of the scheme and artifice that, on or about March 18, 2015, Tricare, through PBM Express Scripts, ultimately paid defendant ECONO for the claim submitted for R.K.'s receipt of the High-Yield Medication.

64)     It was further a part of the scheme and artifice that, on or about August 7, 2014, a person known to the U.S. Attorney as C.R., a Tricare beneficiary, received nutritional shakes and High-Yield Medication from defendant PREMIER MED, after C.R. had provided his/her insurance information to defendant INSURE NUTRITION.

65)     It was further a part of the scheme and artifice that, on or about August 20, 2014, Tricare, through PBM Express Scripts, ultimately paid defendant PREMIER MED for the claim submitted for C.R.'s receipt of the High-Yield Medication.

66)     It was further a part of the scheme and artifice that, on or about September 12, 2014, October 22, 2014, November 14, 2014, January 8, 2015, and February 18, 2015, C.R. also received nutritional shakes and High-Yield Medications from defendant PREMIER MED.

67)     It was further a part of the scheme and artifice that, on or about October 1, 2014, November 12, 2014, November 26, 2014, January 21, 2015, and March 4, 2015, Tricare, through PBM Express Scripts, ultimately paid defendant PREMIER MED for the claims submitted for C.R.'s receipt of the High-Yield Medications.

68)     It was further a part of the scheme and artifice that, on or about August 25, 2014, a person known to the U.S. Attorney as G.K., a Tricare beneficiary, received nutritional

shakes and High-Yield Medication from defendant PREMIER MED, after G.K. had provided his/her insurance information to INSURE NUTRITION.

69)     It was further a part of the scheme and artifice that, on or about September 3, 2014, Tricare, through PBM Express Scripts, ultimately paid defendant PREMIER MED for the claim submitted for G.K.'s receipt of the High-Yield Medication.

70)     It was further a part of the scheme and artifice that, on or about September 24, 2014, October 30, 2014, December 2, 2014, March 16, 2015, May 6, 2015, and May 19, 2015, G.K. also received nutritional shakes and High-Yield Medications from defendants PREMIER MED and ECONO.

71)     It was further a part of the scheme and artifice that, on or about October 1, 2014, November 12, 2014, December 10, 2014, April 1, 2015, May 13, 2015, and May 27, 2015, Tricare, through PBM Express Scripts, ultimately paid defendants PREMIER MED and ECONO for the claims submitted for G.K.'s receipt of the High-Yield Medications.

72)     It was further a part of the scheme and artifice that, on or about March 18, 2016, a person known to the U.S. Attorney as J.P., a Highmark beneficiary, received nutritional shakes and High-Yield Medication from defendant DQD ENTERPRISE to an address in Erie, Pennsylvania, after J.P. had provided his/her insurance information to defendant INSURE NUTRITION.

73)     It was further a part of the scheme and artifice that no copay was collected from J.P., a resident of Erie, Pennsylvania, for the High-Yield Medication.

74)     It was further a part of the scheme and artifice that, on or about March 15, 2016, Highmark reimbursed PBM Express Scripts, who had paid defendant DQD ENTERPRISE for the claim submitted for J.P's receipt of the High-Yield Medication.

75)    It was further a part of the scheme and artifice that, on or about January 27, 2015, a person known to the U.S. Attorney as D.W., a Highmark beneficiary, received nutritional shakes and High-Yield Medication from defendant ECONO to an address in Erie, Pennsylvania, after D.W. had provided his/her insurance information to defendant INSURE NUTRITION.

76)    It was further a part of the scheme and artifice that no copay was collected from D.W., a resident of Erie, Pennsylvania, for the High-Yield Medication.

77)    It was further a part of the scheme and artifice that, on or about January 27, 2015, Highmark reimbursed PBM Express Scripts, who had paid defendant ECONO for the claim submitted for D.W.'s receipt of the High-Yield Medication.

78)    It was further a part of the scheme and artifice that, on or about February 24, 2015, March 30, 2015, and April 29, 2015, D.W. also received nutritional shakes and High-Yield Medications from defendant ECONO to an address in Erie, Pennsylvania.

79)    It was further a part of the scheme and artifice that D.W. did not pay any copay for these High-Yield Medications.

80)    It was further a part of the scheme and artifice that, on or about March 3, 2015, March 31, 2015, and May 5, 2015, Highmark reimbursed PBM Express Scripts, who had paid defendant ECONO for the claim submitted for D.W.'s receipt of these High-Yield Medications.

81)    It was further a part of the scheme and artifice that, on or about February 24, 2015, a person known to the U.S. Attorney as K.C., a Highmark beneficiary, received nutritional shakes and High-Yield Medication from defendant ECONO to an address in Erie, Pennsylvania, after K.C. had provided his/her insurance information to defendant INSURE NUTRITION.

22

82)     It was further a part of the scheme and artifice that no copay was collected from K.C., a resident of Erie, Pennsylvania, for the High-Yield Medication.

83)     It was further a part of the scheme and artifice that, on or about March 3, 2015, Highmark reimbursed PBM Express Scripts, who had paid defendant ECONO for the claim submitted for K.C.'s receipt of the High-Yield Medication.

84)     It was further a part of the scheme and artifice that, on or about March 30, 2015, April 24, 2015, and September 18, 2016, K.C. also received nutritional shakes and High-Yield Medications from defendants ECONO and DQD ENTERPRISE to an address in Erie, Pennsylvania.

85)     It was further a part of the scheme and artifice that K.C. did not pay any copay for these High-Yield Medications.

86)     It was further a part of the scheme and artifice that, on or about March 31, 2015, May 5, 2015, and September 27, 2016, Highmark reimbursed PBM Express Scripts, who had paid defendants ECONO and DQD ENTERPRISE for the claim submitted for K.C.'s receipt of these High-Yield Medications.

87)     It was further a part of the scheme and artifice that, on or about July 26 and 27, 2016, a person known to the U.S. Attorney as H.S., a Highmark beneficiary, received nutritional shakes and High-Yield Medication from defendant DQD ENTERPRISE to an address in the Western District of Pennsylvania, after H.S. had provided his/her insurance information to defendant INSURE NUTRITION.

88)     It was further a part of the scheme and artifice that no copay was collected from H.S., a resident of Hermitage, Pennsylvania, for the High-Yield Medication.

89)     It was further a part of the scheme and artifice that, on or about July 26, 2016, Highmark reimbursed PBM Express Scripts, who had paid defendant DQD ENTERPRISE for the claim submitted for H.S.'s receipt of the High-Yield Medication.

90)     It was further a part of the scheme and artifice that, on or about August 19, 2016 and September 12, 2016, H.S. also received nutritional shakes and High-Yield Medications from defendant DQD ENTERPRISE to an address in Erie, Pennsylvania.

91)     It was further a part of the scheme and artifice that H.S. did not pay any copay for these High-Yield Medications.

92)     It was further a part of the scheme and artifice that, on or about August 23, 2016 and September 26, 2016, Highmark reimbursed PBM Express Scripts, who had paid defendant DQD ENTERPRISE for the claim submitted for H.S.'s receipt of these High-Yield Medications.

## COUNT ONE
### (Conspiracy)

The United States Attorney further charges:

93)     Paragraphs 1 through 21, 33, 35 through 44, 46 through 53, 60, and 62 through 71 above are hereby realleged and incorporated by reference herein, as if fully stated.

94)     From in and around September 2013, and continuing thereafter until in and around July 2015, in the Western District of Pennsylvania and elsewhere, the defendants, NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, JOSEPH KOHAN, INSURE NUTRITION, AFFORDABLE, ECONO, EMERSON, PREMIER MED, and VILLAGE, knowingly and willfully did conspire, combine, confederate and agree together and with each other, and with other persons known and unknown to the U.S. Attorney, to commit the following offense against the United States:

(a)     to knowingly and willfully offer and pay remunerations (including any kickback, bribe, or rebate), directly and indirectly, overly and covertly, in cash and in kind, that is nutritional shakes, to bariatric patients to induce such patients to purchase, order, and arrange for the purchase and ordering of prescription drugs, that is, High-Yield Medications, for which payment was made by a federal health care program, that is, Tricare, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

OVERT ACTS

95)     In furtherance of the conspiracy, and to effect the objects of the conspiracy, the defendants, NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, JOSEPH KOHAN, INSURE NUTRITION, AFFORDABLE, ECONO, EMERSON, PREMIER MED, and VILLAGE, and co-conspirators both known and unknown to the U.S. Attorney, did commit and

cause to be committed, the following overt acts, among others, in the Western District of Pennsylvania and elsewhere:

(a)     On or about March 3, 2015, R.K., a Tricare beneficiary, received High-Yield Medication from defendant ECONO to an address in Erie, Pennsylvania, after R.K. had provided his/her insurance information to defendant INSURE NUTRITION on the belief R.K. would receive nutritional shakes.

(b)     On or about March 18, 2015, Tricare, through Express Scripts, ultimately paid defendant ECONO for the claim submitted for R.K.'s receipt of the High-Yield Medication.

(c)     On or about August 7, 2014, C.R., a Tricare beneficiary, received High-Yield Medication from defendant PREMIER MED, after C.R. had provided his/her insurance information to defendant INSURE NUTRITION on the belief C.R. would receive nutritional shakes.

(d)     On or about August 20, 2014, Tricare, through Express Scripts, ultimately paid defendant PREMIER MED for the claim submitted for C.R.'s receipt of the High-Yield Medication.

(e)     On or about September 12, 2014, C.R. received additional High-Yield Medication from defendant PREMIER MED, after C.R. had provided his/her insurance information to defendant INSURE NUTRITION on the belief C.R. would receive nutritional shakes.

(f)     On or about October 1, 2014, Tricare, through Express Scripts, ultimately paid defendant PREMIER MED for the claim submitted for C.R.'s receipt of the High-Yield Medication.

(g)     On or about August 25, 2014, G.K., a Tricare beneficiary, received High-Yield Medication from defendant PREMIER MED, after G.K. had provided his/her insurance information to defendant INSURE NUTRITION on the belief G.K. would receive nutritional shakes.

(h)     On or about September 3, 2014, Tricare, through Express Scripts, ultimately paid defendant PREMIER MED for the claim submitted for G.K.'s receipt of the High-Yield Medication.

(i)     On or about May 6, 2015, G.K. received additional High-Yield Medication from defendant ECONO, after G.K. had provided his/her insurance information to defendant INSURE NUTRITION on the belief G.K. would receive nutritional shakes.

(j)     On or about May 13, 2015, Tricare, through Express Scripts, ultimately paid defendant ECONO for the claim submitted for G.K.'s receipt of the High-Yield Medication.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
**(Fraud Conspiracy)**

The United States Attorney further charges:

96)      Paragraphs 1 through 32, 34 through 61, and 72 through 92 above are hereby realleged and incorporated by reference herein, as if fully stated.

97)      From in and around September 2013, and continuing thereafter until in and around May 2018, in the Western District of Pennsylvania and elsewhere, the defendants, NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, JOSEPH KOHAN, INSURE NUTRITION, AFFORDABLE, ASC PHARMACEUTICAL, DQD ENTERPRISE, DTST VENTURES, ECONO, EMERSON, GENOREX, NUTRITION PLUS, PHARMATEK PHARMACY, PREMIER MED, REXFORD, SOLUTECH, SPMA, VILLAGE, and VITAMED, knowingly and willfully did conspire, combine, confederate and agree together and with each other, and with other persons known and unknown to the U.S. Attorney, to commit the following offense:

(a)      to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs, that is, the Private Carriers, and to obtain monies and properties owned by and under the custody and control of health care benefit programs, that is, the Private Carriers, by means of false and fraudulent pretenses, representations, and promises, that is, not collecting copays for High-Yield Medications that were submitted as claims to the PBMs, while falsely representing and creating the pretense that copays were collected, in violation of Title 18, United States Code, Sections 1347.

In violation of Title 18, United States Code, Section 1349.

## COUNT THREE
### (Health Care Fraud)

The United States Attorney further charges:

98)      Paragraphs 1 through 32, 34 through 61, and 72 through 92, and 97 above are hereby realleged and incorporated by reference herein, as if fully stated.

99)      From in and around September 2013, and continuing thereafter until in and around May 2018, in the Western District of Pennsylvania and elsewhere, the defendants, NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, JOSEPH KOHAN, and INSURE NUTRITION, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, that is, the Private Carriers, and to obtain monies and properties owned by and under the custody and control of health care benefit programs, that is, the Private Carriers, by means of false and fraudulent pretenses, representations and promises, that is, falsely representing and creating the pretense that copays were collected, in connection with the delivery of and payment for health care benefits, items, and services, that is, the claims submitted for the High-Yield Medications.

100)    On or about March 18, 2016, without collecting any copay, defendants NIMA RODEFSHALOM, MEHRAN DAVID KOHANBASH, JOSEPH KOHAN, and INSURE NUTRITION, submitted and caused to be submitted to Highmark, in the Western District of Pennsylvania, a prescription drug claim seeking payment for High-Yield Medication that was delivered to J.P. in Erie, Pennsylvania.

All in violation of Title 18, United States Code, Section 1347.

## FORFEITURE ALLEGATIONS

101)   The United States Attorney realleges and incorporates by reference the allegations contained in Counts One through Three of this Information for the purpose of alleging criminal forfeiture pursuant to Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p).

102)   The United States hereby gives notice to the defendants charged in Counts One through Three that, upon conviction of any such offense, the government will seek forfeiture in accordance with: Title 18, United States Code, Sections 982(a)(7) and/or 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which requires any person convicted of such offenses to forfeit any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to such offenses, including but not limited to the following:

(a)   SPECIFIC PROPERTY

Bank accounts seized pursuant to seizure warrants at Magistrate Numbers 18-28 through 18-44 in the Western District of Pennsylvania, Erie Division, including the following:  $13,652,531.55 formerly contained in JPMorgan Chase Bank Account ending in x87729; $1,780,189.01 formerly contained in JPMorgan Chase Bank Account ending in x18727; $1,220,577.37 formerly contained in JPMorgan Chase Bank Account ending in x93986; $1,160,298.04 formerly contained in JPMorgan Chase Bank Account ending in x95510; $883,818.12 formerly contained in JPMorgan Chase Bank Account ending in x27006; $830,869.03 formerly contained in JPMorgan Chase Bank Account ending in x67278; $773,080.42 formerly contained in JPMorgan Chase Bank Account ending in x23083; $374,414.64 formerly contained in JPMorgan Chase Bank Account ending in x76195; $324,625.35 formerly contained in JPMorgan Chase Bank Account ending in x50695; $139,703.99 formerly contained in JPMorgan Chase Bank Account ending in x18300; $71,039.93

formerly contained in JPMorgan Chase Bank Account ending in x88132; $937,442.76 formerly contained in Citibank Account ending in x07283; $667,089.15 formerly contained in Citibank Account ending in x49851; $29,357.31 formerly contained in Citibank Account ending in x49869; $1,263,695.36 formerly contained in Wells Fargo Bank Account ending in x82440; $1,004,714.39 formerly contained in Wells Fargo Bank Account ending in x82523; and Bank of America Account ending in x06520.

(b)     MONEY JUDGMENT

A sum of money equal to at least approximately $54,500,000 in United States currency.

103)    If any of the forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred, sold to, or deposited with a third person;

(c)     has been placed beyond the jurisdiction of the Court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any property of such defendant up to the value of the forfeitable property described in this forfeiture allegation.

SCOTT W. BRADY
United States Attorney
PA ID No. 88352

31